# No. 13-4245(L)

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA

**Plaintiff-Appellee,**

**v.**

### IRVINE JOHNSTON KING, a/k/a Irvine Johnson King

**Defendant-Appellant.**

---

### UNITED STATES OF AMERICA

**Plaintiff-Appellee,**

**v.**

### AISHA RASHIDATU KING

**Defendant-Appellant.**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, 1:12-CR-00180 (HILTON, J.)

---

## BRIEF FOR DEFENDANTS-APPELLANTS

---

Eric A. White
John P. Elwood
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6549
Fax: (202) 315-3392
ewhite@velaw.com

*Counsel for Defendants-Appellants*
*Irvine and Aisha King*

September 5, 2013

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF ISSUE ........................................................................... 1

STATEMENT OF CASE ............................................................................ 1

STATEMENT OF FACTS .......................................................................... 3

    A.   A Medicaid Fraud Investigation Leads First to State then
        Federal Charges ...................................................................... 5

    B.   Bright Beginnings' Employees, Not the Kings, Were In
        Charge of Billing ..................................................................... 7

    C.   The Vast Majority of the Government's Witnesses Did Not
        Link the Kings to Any Fraud ................................................. 10

    D.   The Trial Court Attempted to Rush Counsel through Trial .......... 15

    E.   The Trial Court Repeatedly Rebuffed the Confused Jury's
        Requests for Clarification ..................................................... 16

SUMMARY OF ARGUMENT .................................................................. 18

ARGUMENT ........................................................................................... 20

I.    Standard of Review ........................................................................ 20

II.   The Trial Court Abused Its Discretion When It Selectively
     Recharged the Jury Only with Language from the Charged
     Offenses .......................................................................................... 21

    A.   The Sum Total of the Jury's Questions Evinced Substantial
        Confusion and Warranted Reinstruction of the Full Jury
        Charge .................................................................................. 22

    B.   Prior Decisions of This Court and Other Circuits Support
        Finding That the Trial Court Abused Its Discretion When It
        Selectively Reinstructed the Jury Only with Language from
        the Charged Offenses ............................................................ 27

C.  The Trial Court's Selective Reinstruction Prejudiced the
    Kings' Defense ................................................................. 31

    1.  The Trial Court's Selective Reinstruction Undercut the
        Defense's Theory of the Case ................................. 32

    2.  The Trial Court's Directives to Counsel to Speed Along
        the Trial Further Prejudiced the Defense ............................. 37

CONCLUSION ........................................................................ 41

STATEMENT CONCERNING ORAL ARGUMENT ............................... 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*Arroyo v. Jones*,
    685 F.2d 35 (2d Cir. 1982) ................................................................ 27, 37

*Bollenbach v. United States*,
    326 U.S. 607 (1946).......................................................................... 21, 36

*Davis v. Greer*,
    675 F.2d 141 (7th Cir. 1982) .................................................................. 25

*Gacy v. Welborn*,
    994 F.2d 305 (7th Cir. 1993) ............................................................ 24, 36

*Martel v. County of Los Angeles*,
    56 F.3d 993 (9th Cir. 1995) ..................................................................... 40

*Simpson v. Lambert Bros. Div.-Vulcan Materials Co.*,
    362 F.2d 731 (4th Cir. 1966) ............................................................ 24, 37

*United States v. Blanchard*,
    542 F.3d 1133 (7th Cir. 2008) ................................................................. 40

*United States v. Carter*,
    491 F.2d 625 (5th Cir. 1974) ............................................................ 25, 26

*United States v. Curry*,
    538 F.3d 718 (7th Cir. 2008) ................................................................... 40

*United States v. Foster*,
    507 F.3d 233 (4th Cir. 2007) ......................................................20-21, 31

*United States v. Glover*,
    681 F.3d 411 (D.C. Cir. 2012)........................................................... 24, 36

*United States v. Godwin*,
    272 F.3d 659 (4th Cir. 2001) ................................................................... 40

*United States v. Harris*,
    346 F.2d 182 (4th Cir. 1965) .................................................................. 31

*United States v. Hickman*,
    592 F.2d 931 (6th Cir. 1979) .................................................................. 40

**Cases (cont.)**                                                      **Page(s)**

*United States v. Horton*,
   921 F.2d 540 (4th Cir. 1990) ............................................................. 21, 39

*United States v. Laing*,
   889 F.2d 281 (D.C. Cir. 1989) ................................................................ 24

*United States v. United Med. & Surgical Supply Corp.*,
   989 F.2d 1406 (4th Cir. 1993) ................................................ 21, 22, 26, 30

*United States v. Natale*,
   764 F.2d 1042 (5th Cir. 1985) ................................................................. 25

*United States v. Nickl*,
   427 F.3d 1286 (10th Cir. 2005) ............................................................... 40

*United States v. Parodi*,
   703 F.2d 768 (4th Cir. 1983) ................................................................... 41

*United States v. Pennix*,
   Nos. 97-4575 and 97-4576, 1998 WL 279342 (4th Cir.
   May 20, 1998) ........................................................................................ 29

*United States v. Sawyer*,
   443 F.2d 712 (D.C. Cir. 1971) ................................................................. 39

*United States v. Smith*,
   62 F.3d 641 (4th Cir. 1995) ............................................................... 21, 33

*United States v. Thompson*,
   173 F. App'x 205 (4th Cir. 2006) ............................................................ 21

*United States v. Turner*,
   No. 97-4104, 1998 WL 67797 (4th Cir. Feb. 20, 1998) ......................... 30

*United States v. Van Dyke*,
   14 F.3d 415 (8th Cir. 1994) .................................................... 27, 29, 32, 38

*Wellington v. Daniels*,
   717 F.2d 932 (4th Cir. 1983) ................................................................... 22

iv

**Statutes**                                                        **Page(s)**

18 U.S.C. § 2 .................................................................................2

18 U.S.C. § 1028A ..........................................................................2

18 U.S.C. § 1028A(a)(1) ............................................................ 18

18 U.S.C. § 1028A(c)(5) ............................................................ 18

18 U.S.C. § 1347 .................................................................... 2, 18

18 U.S.C. § 1349 .................................................................... 1, 18

18 U.S.C. § 3231 ............................................................................1

28 U.S.C. § 1291 ............................................................................1

**Other Authorities**

Reid Hastie, Steven D. Penrod, & Nancy Pennington,
    *Inside the Jury* (1983) ..................................................... 24

Harry Kalven, Jr. & Hans Zeisel,
    *The American Jury* (1966) ............................................... 24

United States Sentencing Commission, *Guidelines Manual*,
    §§ 2B1.1, 3B1.1, 3B1.3 (Nov. 2010) ..................................2

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the district court in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered judgment on March 28, 2013, and Mr. and Mrs. King filed notices of appeal that same day. JA688-JA695. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

Whether the district court abused its discretion when, after receiving several questions from the jury indicating it was confused about the factual and legal issues in the case, the court selectively reinstructed the jury only with information favorable to the prosecution.

## STATEMENT OF CASE

On June 28, 2012, the United States indicted Irvine and Aisha King ("the Kings") for submitting allegedly fraudulent billings to Medicaid and BlueCross/BlueShield between March 2008 and June 2011 while running their home nursing company, Bright Beginnings Healthcare Services Inc. ("Bright Beginnings"). JA22. The indictment charged the Kings with one count each of conspiracy to commit health care fraud under 18 U.S.C. § 1349; Mr. King with 22 counts and Mrs. King with 13 counts of health care fraud for the submission of

false claims under 18 U.S.C. §§ 1347 and 2; and each of the Kings with two counts of aggravated identity theft under 18 U.S.C. § 1028A.  JA22-JA29.

The matter was tried before a jury from January 7 to January 9, 2013, before the Honorable Claude Hilton of the United States District Court for the Eastern District of Virginia.  After deliberating for part of the afternoon on January 9, the jury returned a verdict of guilty on all counts on January 10, 2013.

At sentencing, the court summarily denied the Kings' renewed motions for judgments of acquittal, and adopted the guidelines calculation contained in the Kings' Presentence Investigation Reports ("PSRs").  Sentencing Tr. (Doc. 98), at 6.  The court thus concluded that Bright Beginnings submitted over 5,201 false claims to Medicaid totaling $1,994,538.32, and 220 claims to BlueCross/BlueShield, totaling $177,291.39.  With applicable adjustments and enhancements, the Kings' offense level was 30, providing a guidelines range of 97-121 months (which was capped at the statutorily authorized maximum of 120 months).  *See generally* No. 1:12-cr-00180, Irvine King PSR (Doc. 54), at 12-13 & Worksheets A & D; Aisha King PSR (Doc. 52), at 11-12 & Worksheets A & D; United States Sentencing Commission, *Guidelines Manual*, §§ 2B1.1, 3B1.1, 3B1.3 (Nov. 2010).

The court sentenced the Kings at the low end of the guidelines range, 97 months, to be followed by the required 24-month consecutive sentence for the two

identity-theft counts, resulting in a total sentence of 121 months. *See* Sentencing Tr. (Doc. 98) at 7, 16. The court also ordered restitution in the amount calculated in the PSR that Medicaid and BlueCross/BlueShield collectively paid Bright Beginnings on the applicable claims, $931,894.16. *See id.*; Irvine King PSR (Doc. 54), at 11, 22; Aisha King PSR (Doc. 52), at 11, 21.

The Kings filed timely notices of appeal on March 28, 2013. JA694, JA695. On August 13, the district court denied the Kings' request for bond pending appeal and for additional time to self-surrender to permit them to complete state-court proceedings to allow a relative to take custody of their three young children; those custody proceedings have not yet been completed.

Mr. and Mrs. King began serving their 10-year-plus sentences on August 14, 2013.

## STATEMENT OF FACTS

Aisha and Irvine King ran a home health care company, Bright Beginnings, in Woodbridge, Virginia, that at any one time served around 25 Medicaid patients and a few with private insurance. JA209-JA210 (testimony of Violet Kincaid). Nurses employed by the company would provide care to patients, and would record and report their time to Bright Beginnings, which would then bill Virginia Medicaid. JA62-JA63 (Chris Elliott, Policy Analyst for Virginia Medicaid).

Though the Kings were hard-working immigrants, they had no background in business and no experience as managers. Following a three-day trial at which the government presented the testimony of some 22 witnesses, one thing was made certain: Bright Beginnings was not a well-run business. Recordkeeping at the home health care operation was, in the words of one former employee, "a mess . . . . [T]here was not great communication between the nurses and the office." JA211 (Kincaid). Another former employee, Jody Allen, described the office around that same time period as completely disorganized, with "lots of papers or nurse's notes that were filed in the wrong files." JA322. Indeed, Allen was so overwhelmed by the disorder that she quit after one month. JA323. Many nurses were derelict in sending in their required time sheets in a timely manner, JA211 (Kincaid), and employees in charge of billing would often enter time before receiving the official time sheets, JA251-JA252, JA255 (Kincaid).

But the government maintained that Bright Beginnings' problems went beyond the Kings' inexperience as managers. The government's fraud theory rested on its belief that the Kings intentionally billed Medicaid (and BlueCross/BlueShield) for services they knew were not provided, and when those overbillings were detected, that the Kings orchestrated a scheme to cover up that fraud. *See* JA38-JA39 (Opening Statement of Assistant U.S. Attorney Grist). The government introduced what it characterized as a "volume of evidence" (JA607

(Assistant U.S. Attorney Belevetz)) suggesting billing irregularities, which the Kings never denied. But the leap from oversights in running the business to intentional fraud over the period March 2008 to June 2011 depended on a series of inferences gleaned from among the government's 22 witnesses.

### A.    A Medicaid Fraud Investigation Leads First to State then Federal Charges

Bright Beginnings' troubles began in May 2009, when Virginia Medicaid informed the company that it would be conducting a field audit in just under two weeks. *See* Gov't Ex. 40; JA96 (Joann Hicks, Audit Supervisor). The letter did not specify which patients the audit would cover, *see* JA96; Bright Beginnings was informed of the six patients' names only a few days before the audit, *see* JA99. The audit supervisor later testified at trial that "[t]he majority of the errors are best summarized as undocumented services." JA116. It is not uncommon, she said, for providers to be audited and for documentation ultimately to be found incomplete. JA151.

Although a lack of documentation does not mean that health care services were not actually rendered, *see* JA88 (Elliott), "[i]n the eyes of [the Virginia Department of Medical Assistance Services], if there is no record, it was not done," JA75 (Elliott); *accord* JA146 (Hicks) ("[S]ervices that aren't documented are assumed to not be rendered."). The missing documentation led Medicaid to

calculate an overpayment to Bright Beginnings of just over $435,000. Gov't Ex. 43 (Overpayment Notification Letter); JA116-JA117.

In January 2010, Bright Beginnings appealed that determination. JA118. In the lead-up to filing additional documentation relevant to the audit, Bright Beginnings employee Violet Kincaid would frequently take the audit appeal paperwork home with her. JA231 (Kincaid). Around April 2010, the company provided the additional documentation, Gov't Ex. 45; JA119, which reduced Virginia Medicaid's calculation of the overpayment from approximately $435,000 to just over $150,000. Gov't Ex. 46 (May 7, 2010 letter); JA129-JA130. Audit Supervisor Hicks believed that the signatures on a few documents appeared suspiciously similar, and thought some of the nurses' notes contained similar narratives, JA122-JA123; as a result, she referred the matter to the Virginia Medicaid Fraud Control Unit, JA131, which then launched an investigation. Hicks' suspicions were based on her lay observation of the documents; she never engaged experts to perform any signature or handwriting analysis.  JA163. (Indeed, to date, the record indicates that *no one* has subjected the documents to any kind of expert analysis.)

The fraud investigations eventually culminated in an FBI search of Bright Beginnings' offices in June 2011.  JA197-JA199 (FBI Special Agent Kelly VanArsdale).  One agent testified at trial that she collected several documents she

believed suggested fraud—including one with a signature cut and pasted onto it, Gov't Ex. 61; JA200; a police report with pieces of it cut out, Gov't Ex. 62; JA201; documents with signatures or dates whited out, Gov't Exs. 59, 60, 63, 65; JA201-JA202; a document with a taped-on photocopied signature, Gov't Ex. 64; JA202; and several documents with what appeared to be photocopied signatures, Gov't Exs. 57, 58, 66, 67, 68-B; JA201-JA203. The agent testified that she did not know who altered any of the documents. JA204.

On the same day as the FBI search, the Commonwealth of Virginia charged Mr. King with several counts of making a false statement for payment, *see* Irvine King PSR (Doc. 54), at 15, and Mrs. King for one count of forgery, *see* Aisha King PSR (Doc. 52), at 13. In March 2012, the Commonwealth decided to *nolle prosequi* the charges against Mrs. King. *See id.* In June 2012, the Commonwealth likewise dropped the charges against Mr. King. *See* Irvine King PSR (Doc. 54), at 15. Later that same month, however, the United States indicted Mr. and Mrs. King on the charges at issue here. *See* JA19-JA30.

## B.    Bright Beginnings' Employees, Not the Kings, Were In Charge of Billing

As with most businesses, the Kings did not personally run every aspect of operations at Bright Beginnings. It was undisputed at trial that Josephine Owusu was responsible for all billing from at least September 2008 (JA321-JA322 (Allen)) through October or November 2009—that is, during the period that was

7

the subject of the May 2009 audit—at which time she was fired, *see* JA236-JA237 (Kincaid); JA321 (Allen); JA536-JA537 (Nadia Kanu, Licensed Practical Nurse). Owusu was also the contact person for the Virginia Medicaid audit. JA135 (Hicks). It was Owusu who provided documentation for the audit, JA135-JA136, and correspondence from Virginia Medicaid during the audit process was addressed to Owusu, *see* Gov't Ex. 42; JA136. While employed at Bright Beginnings, Owusu handled everything related to billing—in what by all accounts was a haphazard manner, with "nurses' notes all over the place." JA241 (Kincaid).

Violet Kincaid started working at Bright Beginnings in September 2009. When Owusu was fired in late fall 2009, Kincaid took over billing. JA210. Although Kincaid maintained that she only performed billing duties for a few weeks, JA211, JA213, JA244—and admitted that she "mess[ed] it up" when she did so, JA213—other government witnesses described Kincaid as the person in charge of billing at Bright Beginnings for months, from when she took over for Owusu in fall 2009 until she left in March 2010. JA340 (Allen); *see also* JA321 (Allen) ("For the first month that I was there, Josephine Owusu [performed the billing]. When she left, Violet Kincaid [did so]. When she left, Irvine King [did].").

In fact, when confronted with evidence suggesting that she had continued to perform billing well into 2010, Kincaid admitted that "[i]t's possible that I had the

8

time sheets at my home and was preparing them for Irvine." JA300 (Kincaid). And she admitted that at least at one point in February 2010 she "went in to do the billing on [Mr. King's] computer." JA275. Although the billing computer was indeed on Mr. King's desk at the time, it is undisputed that Kincaid had unhindered access to it by using King's billing passcode. JA397 (Allen). In any event, it was Kincaid who prepared documents summarizing the hours nurses worked that were later used for billing. JA211. When creating these documents, Kincaid would often record time before receiving the required time sheets because, as she put it, "[t]hey were nurses that I had worked with for a very long time. There was a trust factor there, and I knew that I would get the time sheet." JA265. All the Medicaid billing was submitted electronically, meaning that no one could be certain who submitted any particular bill. *See* JA81-JA82 (Elliott). No witness testified that they ever saw Aisha submit a bill to Medicaid, let alone a false one. *See* JA297 (Kincaid).

After Kincaid's departure, Bright Beginnings hired Tiffany Ferguson to act as the company's staffing coordinator. JA403 (Tiffany Ferguson). Ferguson did not submit bills to Medicaid but participated in the billing process by creating documents and charts cataloging information from the notes nurses submitted to the office. JA421. She testified that she complied with the instructions she claimed Mrs. King had given her: simply to transfer nurses' notes in whatever

9

manner they were submitted onto the proper form for records.  JA423.  Despite working at Bright Beginnings from April 2010 right up until the company was effectively shut down in June 2011, Ferguson testified that she never witnessed anyone or heard of anyone filling out Medicaid forms to include time not listed in the charts Ferguson herself created, and was never aware of any fraud.  JA420.  Ferguson said she was never asked to falsify anything.  JA423.

### C.    The Vast Majority of the Government's Witnesses Did Not Link the Kings to Any Fraud

The government called as witnesses several parents of children who had been patients of Bright Beginnings.  Eric Noakes testified that because of his daughter's hospitalization, JA426, her care for the week of December 14 to December 20, 2009, consisted of only 68 hours of nursing services, not the 112 hours (the maximum number of reimbursable hours for regular nursing care) and 20 hours of additional "respite" care billed by Bright Beginnings on December 26, *see* JA426-JA428.  Similarly, Betheny Burke testified that the large snowstorm in February 2010 meant that her nurse only provided 56 hours of care instead of the 112 hours billed by Bright Beginnings on February 13, 2010.  *See* JA300-JA301.  From December 2009 through February 2010, Kincaid entered the billings for Bright Beginnings, *see, e.g.*, JA321, JA340 (Allen); only Kincaid—*i.e.*, the only other person who could have been responsible for billing—claimed that Mr. King entered the billings for Bright Beginnings during this period, JA213 (Kincaid).

Because the bills were submitted electronically, it is impossible to tell who submitted any particular bill. *See* JA81-JA82 (Elliott).

Abid Hussain testified that the nurses whose names were listed on time sheets containing his signature did not actually provide nursing services for his son, JA568, and that, in any event, his son did not receive nursing care at all from December 2009 through February 2010 because he was in Pakistan for much of the time, JA566-JA569. Hussain also claimed that the Kings visited him prior to December 2009 to ask him to sign blank nursing time sheets because "they messed up the paper" and "needed records," JA570, and he complied, *see* JA571; *accord* JA577-JA579. Hussain's wife, a certified nursing assistant, was the Bright Beginnings employee who provided care for his son. JA573. Although Hussain claimed that his wife never submitted time sheets for care in 2010, and never received payment for care that year, JA574, he admitted that cashed paychecks made out to his wife for that period contained what appeared to be his wife's signature as an endorsement, JA578-JA579; *see also* Def. Ex. 10 (checks from 2010).

The government also called several care providers whose signatures appeared on nursing time sheets during periods the providers claimed they did not provide care or for patients for whom they never provided care. Ramatu Fofana, a licensed practical nurse, worked for Bright Beginnings for a couple months in

11

2009.  JA542-JA543.  Although billing records indicated that she provided weekend care in February 2010, Fofana claimed she provided no such care.  *See* JA546-JA547.  Yvonne Morales, a registered nurse, testified that she did not provide care for the period January 31 to February 12, 2010, because her patient was in the hospital.  JA502-JA503.  Isha Marah Dura, a registered nurse, JA365, testified that her signature appeared on several documents relating to people who were not her patients.  JA368-JA369.  Nadia Kanu, a licensed practical nurse, testified that Mrs. King told her to add missing nurses' notes to blank forms, JA519-JA520, and described a number of instances where nurses' signatures appeared on forms listing patients for whom they did not provide care, JA521-JA527.  Kanu later went on to work for a home health care company run by Josephine Owusu, JA530, the person whom the Kings had fired and whom Kanu identified as responsible for the billing at Bright Beginnings, JA536-JA537.  Amanda Drah, a licensed practical nurse, testified that she applied for a position at Bright Beginnings in January 2008 but was never offered a job.  JA554-JA558.  She said that she never provided nursing services to the patient listed on several time sheets and never signed the documents bearing her signature.  JA555.  She later went on to work for a home health care company run by Nenneh Blell.  JA558.

Nenneh Blell worked at Bright Beginnings from late 2008 through January 2010. JA434 (Blell). Testifying pursuant to a cooperation agreement under which she provided testimony in exchange for the government's agreement not to prosecute her, *see* JA431-JA432, JA459, Blell claimed that although she informed Mrs. King that she was not a licensed nurse, Mrs. King provided her with a job anyway and told her to sign the nursing notes with the name Ramatou [sic] Fofana, and that she did so. JA437. Blell testified that, while impersonating Fofana, she provided care for Nicole Justice's child, in the process lying to Justice about her name and qualifications and telling her that she used the name Fofana on the official forms because that was the name on her (in fact non-existent) nursing license. *See* JA169-JA170 (Nicole Justice). Justice—who at the time had become close friends with Blell and even spent several months working for her, JA188—testified that Mrs. King backed up Blell's story that she was Fofana, JA171-JA172. When a dispute arose over signatures and the use of back-up respite care for Justice's child, JA179, JA182 (Justice), Blell stated that Mrs. King told her to lie to Medicaid, JA452. Blell also testified that she saw Mrs. King sign another nurse's name on forms while Mr. King was present. JA448-JA449. After Bright Beginnings began to crumble, a still-unlicensed Blell went to work for a competing home health care company run by Josephine Owusu, JA496-JA497 (Blell)—the woman who, before being fired in late fall 2009, was responsible for billing at

13

Bright Beginnings, *see* JA236-JA237 (Kincaid); JA321 (Allen); JA536-JA537 (Kanu). At the time of trial, a finally-licensed Blell had opened up her own home health care company in the same town where Bright Beginnings once operated, JA433, employing a number of the Kings' former employees including one of the government's other witnesses. *See* JA558 (Drah).

At the end of the prosecution's case-in-chief, FBI special agent Marla Vanderbunt summarized the numerous documents the government introduced and presented a spreadsheet comparing the nursing hours billed with the hours for which there was documentation. *See* JA585-JA587 (Vanderbunt). Agent Vanderbunt acknowledged that, in preparing the summary, she did not look into Bright Beginnings' payroll records to see what hours nurses had been paid for working. JA591-JA592. In other words, she never checked whether the individual nurses or Bright Beginnings had received the benefit of the excessive hours the government alleged had been billed, a key indication of who was responsible for any false statements that were made. *Cf.* JA332 (Allen) (agreeing that "some of the nurses were getting paid, but they were not submitting their time sheets"). Nor did she refer to the spreadsheets Ferguson created for Mr. King to use so that he would have the number of hours nurses worked when he performed billing, *see* JA593 (Vanderbunt).

14

The district court denied the Kings' motions for judgment of acquittal. JA580. The defense elected not to call any witnesses, and rested its case. *See* JA603.

### D.     The Trial Court Attempted to Rush Counsel through Trial

Throughout the trial, the court made plain—to the Kings, their counsel, and the jury—its determination that the trial must be concluded quickly, and by necessary implication, that the matters being addressed were insufficiently important to warrant the court's—or the jury's—time. Toward the end of the second day of testimony, the court told counsel that "[w]e ought to finish this case today," JA425, and that, with regard to the eight witnesses left to testify—including the prosecution's key witness, Nenneh Blell, who had conceded that she had fraudulently impersonated a Bright Beginnings nurse, whose credibility was highly suspect, and who was testifying under a non-prosecution agreement—"[l]et's get them on and off as quickly as we can," JA426. After counsel for Mr. King finished cross-examining Blell, the judge asked whether counsel for Mrs. King had "any questions of this witness." When counsel replied, "Oh yes," the court responded incredulously (and within earshot of the jury), "Really?" JA474-JA475. As the trial began to wrap up, the court instructed counsel to "make all three of [the last witnesses] real brief," JA560—one of whom was Hussain, the government's sole witness supporting its two identity-theft counts, and Agent

Vanderbunt, the witness who alone supplied the total alleged fraud loss.  Finally, during closing arguments, the court rushed along Mr. King's counsel—twice cutting him off while he was discussing holes in the government' case.  JA637-JA638.  The court's message was clear to everyone present:  Mrs. King's counsel, who spoke next, began his closing argument by assuring the court that "I'm going to hurry up."  JA638.

### E.   The Trial Court Repeatedly Rebuffed the Confused Jury's Requests for Clarification

About an hour after the court provided jury instructions orally, the jury sent a note to the judge asking for "12 copies of the witness list."  JA668.  Although the AUSA offered to provide a list to aid the jurors, the court refused, saying that "[t]hese people need to think about their verdict.  They're wanting too many things."  JA668.  The judge explained to the jury that "[y]ou've heard the witnesses that have testified.  We have no list of them.  You'll just have to remember them as they've come on and they've testified."  JA670.  The jury foreperson explained to the judge that "regarding the witness list, what we're trying to accomplish with that is to be able to keep track of which witness and how the testimony effects" (sic) the outcome, and then alternatively asked for a transcript of the proceedings.  JA670.  The judge explained to the jury that no such transcript (as yet) existed and told it that "there's nothing else I can give you"— instead telling the jury "[y]ou have to reach your verdict based on your collective

16

recollection of the facts and the testimony that's been received and the exhibits that have been introduced into evidence." JA670-JA671.

On the second day of the jury's deliberations, the jury made another request of the court: "Is it possible to obtain the statutes or descriptions of the charges as verbally explained by the judge during the instructions in writing?" JA674. The judge informed counsel of its inclination to read the jury "the statutes and then the essential elements of the offense that the government must prove." JA674. Counsel to Mrs. King (Mike Khouri) objected on the basis that doing so would "emphasize[] certain instructions over others," and in particular highlight the offenses without the necessary context respecting the burden of proof and presumption of innocence. JA675. He urged that "[i]f the Court is going to read instructions regarding the charges, that the Court also reread the instructions on the burden of proof and the reasonable doubt standard at the same time." JA675. Counsel to Mr. King (John Iweanoge) joined in that objection. *See* JA675. The court proposed telling the jury that it "will not go back and pick out certain areas of instructions and give it to them," JA676, to which Khouri replied that he thought that was appropriate, JA676, adding that, "if the jury instructions were back in the jury room, we would just simply . . . tell the jury the answer is in the jury instructions, reread the jury instructions," JA677.

17

Once the court had settled on how it was going to respond to the jury's question, it called the jury, first informing the jurors that "[a]s to your request about receiving the statutes or descriptions to the charges that were given in writing, the answer is no. As I told you, I will not give you anything in writing with regard to the instructions." JA680-JA681. The court then told the jury that, alone of *all* the instructions, "[i]t will instruct you again as to the sections of the code that apply to these charges." He then proceeded to read descriptions of statutes concerning several of the charged offenses—18 U.S.C. §§ 1347, 1349, 1028A(a)(1), 1028A(c)(5). JA681-JA682. The court stopped when the jury foreperson asked an additional question regarding "how aggravated relates to the identity theft charge," JA682, which the court understood to be a clarification of the jury's original request for the statutes or descriptions of the charges, *see* JA683. The court did not answer the question and read no further instructions to the jury, *see* JA682, instead saying he would "let them get on with their verdict," JA683.

A few hours later, the jury returned with a verdict, finding the Kings guilty on all counts. JA683-JA684.

## SUMMARY OF ARGUMENT

Just one hour into deliberations, the jury tasked with deciding the fates of Irvine and Aisha King—husband-wife operators of a home health care business who were tried over three days on multiple counts of conspiracy to commit health

care fraud, health care fraud, and aggravated identity theft—asked the trial court the first in what would become a series of questions that, collectively, made plain the jurors' persistent and substantial confusion about the factual and legal issues in the case. The court rebuffed most of these requests for help, including the jury's effort to obtain written copies of the lengthy jury charge.

Unfortunately, the one time the trial court did attempt to respond substantively to the jury's requests, it not only failed to dispel the jury's confusion, but actually compounded the problem. Over vigorous objections from the Kings' trial counsel, who suggested that the court reinstruct the jury in full or at least put any partial supplemental instruction into proper context, the court selectively reinstructed the jury only with language describing the charged offenses. This one-sided instruction reemphasized parts of the original charge favorable to the government, without mentioning the elements the government needed to prove and the burden with which it must prove them. Case law from this Court and other courts of appeals establish that the trial court's action was erroneous.

That error was prejudicial. The defense's theory of the case was that the Kings were guilty, at most, of being ineffective managers of nurses who were supposed to keep a record of hours worked and office employees who handled billing. To make this case, the Kings relied in large part on poking holes in the government's fraud theory and by discrediting the handful of government

witnesses who testified that the Kings engaged in anything resembling fraud. Their ability to do so relied on the jury's ability to sift through testimony from dozens of witnesses (many of whom had unusual, difficult-to-remember names) and thousands of pages of evidence, and to apply rigorously the government's burden of proof to each element of the offenses with which they were charged. The court's selective reinstruction undercut that defense by failing to alleviate the jury's confusion and instead focusing its attention, in the crucial moment a day into its deliberations and after having received only an oral instruction, on matters favorable to the prosecution.

The flawed reinstruction must also be considered in the context of the trial court's repeated directives to counsel—in the full presence of the jury—to speed up the trial proceedings. Several times, the court's actions inhibited the Kings' counsel from putting on a full defense. Not only that, the court's comments improperly telegraphed to the jury the unmistakable message that the case was open-shut and that the Kings' ability to put on a rigorous defense was unworthy of the court's time.

## **ARGUMENT**

### I.    **Standard of Review**

"[A] district court's decision to respond to a jury's question, and the form of that response," are reviewed for an abuse of discretion. *United States v. Foster*,

507 F.3d 233, 244 (4th Cir. 2007). When "responding to a jury's request for clarification on a charge, the district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice." *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995). An error requires reversal "if [it] is determined to have been prejudicial, based on a review of the record as a whole." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1406-07 (4th Cir. 1993); *see also United States v. Thompson*, 173 F. App'x 205, 206 (4th Cir. 2006) (equating "review of the record as a whole" with general harmless-error analysis).

## II.    The Trial Court Abused Its Discretion When It Selectively Reinstructed the Jury Only with Language from the Charged Offenses

It has long been recognized that the "court has a duty '[w]hen a jury makes explicit its difficulties' to 'clear them away with concrete accuracy.'" *United States v. Horton*, 921 F.2d 540, 546 (4th Cir. 1990) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)). When, as here, the jury has made a "written request for further light on a vital issue," the court's "duty of special care" in responding is paramount. *Bollenbach*, 326 U.S. at 611-12. "Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Id.* at 612.

In response to the jury's question on the second day of deliberations, the trial court reinstructed the jury only on a small portion of the original instructions: the statutory language of the charged offenses. *See* JA680-JA682. Examined in light

of "the record as a whole," *Wellington v. Daniels*, 717 F.2d 932, 934 (4th Cir. 1983)—that is, in the context of several earlier questions suggesting jury confusion; a complicated fraud trial in which the jury was not provided with a full set of written instructions to which it could refer; and the court's multiple statements in the jury's presence that the case did not warrant the time counsel were taking—that selective reinstruction prejudiced the jury, requiring reversal, *see United Med.*, 989 F.2d at 1406-07; *see also id.* at 1406 (noting that a prejudicial jury instruction "mandate[s] reversal") (quoting *Wellington*, 717 F.2d at 938).

**A.    The Sum Total of the Jury's Questions Evinced Substantial Confusion and Warranted Reinstruction of the Full Jury Charge**

The court's response to the jury's request, on the second day of deliberations, to review a copy of "the statutes or descriptions of the charges as verbally explained by the judge during the instructions in writing," JA674, must be considered in the context of the jury's repeated requests of the court, *see, e.g.*, *Wellington*, 717 F.2d at 938 (stating that the court determines whether a supplemental jury instruction was an abuse of discretion "based on a review of the record as a whole").  Taken as a whole, the record shows unequivocally that the jury was substantially confused about the substance of the charges and the evidence against the Kings from the moment the trial ended.

The jury's confusion appears to have stemmed in large part from the fact that the trial court provided the jury with no copies of the lengthy instructions,

22

even after the jury expressly asked for them.   JA674.   Within minutes after receiving oral instructions, the jury requested a "witness list" or a "transcript of the proceedings" "to be able to keep track of which witness and how the testimony effects [sic]."  JA670.  That request, so soon after the court's instructions, provided early notice that the jury was confused, or at least thought it could benefit from the court's assistance.  That the jury was confused about the court's instructions was made manifest the following day, when the jury sought "descriptions of the charges as verbally explained by the judge during the instructions in writing." JA674.

The jurors' confusion was understandable.  After all, they had no reason to anticipate, before or during trial, that they would not receive written copies of the jury instructions to which they would be able to refer when deliberating the Kings' guilt and considering the testimony of the government's 22 witnesses (many of whom had difficult-to-remember, non-Western names) and what the prosecutor described as a "volume of evidence."   JA607.    In its pre-trial "preliminary instructions" to the jury, JA32, the court told the jury that it would "instruct [it] on the law," JA35, but never gave any indication that those instructions would only be given orally, and that, in spite of any expressed confusion, the 17 pages of instructions would be read only once.  Further buttressing the idea that the trial court played an integral role in the jury's confusion, later compounded by the

partial reinstruction on the charged counts alone, the court instructed the jury before trial of its "prefer[ence] that [the jury] not take notes." JA34.

In light of the jury's continued confusion over the course of two days of deliberations, at a minimum, the trial court should have reread (or otherwise provided) the entire set of instructions to the jury, including instructions regarding the burden of proof and reasonable doubt standard. As this Court has repeatedly held, when "the question posed by the jury strongly indicates that the jury had not fully understood and comprehended the court's instructions in chief . . . or had forgotten them. . . . it [is] incumbent upon the court to reinstruct the jury . . . ." *Simpson v. Lambert Bros. Div.-Vulcan Materials Co.*, 362 F.2d 731, 734 (4th Cir. 1966); *see also United States v. Glover*, 681 F.3d 411, 423 (D.C. Cir. 2012) ("'Where the jury explicitly reveals its confusion . . . , the court should reinstruct the jury to clear away the confusion.'") (quoting *United States v. Laing*, 889 F.2d 281, 290 (D.C. Cir. 1989)); *Gacy v. Welborn*, 994 F.2d 305, 312 (7th Cir. 1993) ("Jurors who 'don't get it' on first hearing may do better as the process continues.") (citing Harry Kalven, Jr. & Hans Zeisel, *The American Jury* 149-62 (1966); Reid Hastie, Steven D. Penrod, & Nancy Pennington, *Inside the Jury* 81 (1983)).

Instead, the court merely read back descriptions of the charged offenses, *see* JA682-JA684—as defense counsel objected, *id.* at 3, isolating one part of the jury

charge and in essence restating, in particular, the crimes with which the
government charged the Kings. Even the prosecutor urged the court to also re-
instruct the jury on the particular elements the government had to prove with
respect to the charged crimes, JA679, which would have at least focused the jury's
attention on exactly what the government had to prove for them to reach a finding
of guilty—but the court never did so. Even if the court's supplemental jury
instruction could be seen as technically responsive to the jury's latest question, the
jury's prior (and immediately subsequent) requests made evident that its confusion
was broader than that one isolated question. In light of the jury's repeated requests
for further aid—first, for a list to keep track of the nearly two-dozen witnesses,
JA668-JA670; then for a transcript of the trial proceedings, JA670; then for written
"descriptions of the charges as verbally explained by the judge during [his]
instructions," JA674; then for supplemental instruction on the aggravated identity
theft charge, JA682—the court's selective reinstruction emphasizing provisions in
the charged statutes alone not only did not "respond to the jury's request with
sufficient specificity to clarify the jury's problem, *Davis v. Greer*, 675 F.2d 141,
145 (7th Cir. 1982), but "reemphasized that portion of the instructions favorable to
the government, without mentioning the part favorable to the accused." *United
States v. Natale*, 764 F.2d 1042, 1047 (5th Cir. 1985) (discussing *United States v.
Carter*, 491 F.2d 625, 663 (5th Cir. 1974)).

It is not enough that a court's supplemental instruction could be characterized as responsive to the jury's question. Rather, this Court analyzes "whether the supplemental instruction fairly responded to the jury's question *without creating prejudice*." *United Med.*, 989 F.2d at 1407 (emphasis added). The potential for prejudice with supplemental instructions is high: "[A] trial judge must be acutely sensitive to the probability that the jurors will listen to his additional instructions with particular interest and will rely more heavily on such instructions than on any single portion of the original charge." *Carter*, 491 F.2d at 663. This is especially true in a situation like the one here, where, unlike the first time around, *see* JA32-JA25, by the time of the second charge the jurors knew an oral instruction was all they were going to get. Accordingly, "the court must exercise special care to see that . . . imbalance in supplemental instructions do[es] not poison an otherwise healthy trial." *Carter*, 491 F.2d at 633.

The court's selective reinstruction here reemphasized the offenses charged by the government without providing the necessary context respecting the government's burden of proof and the Kings' presumption of innocence. The court's insistence "not [to] give [the jury] anything in writing with regard to the instructions," JA681, meant that the jury did not have a complete set of instructions that it could reexamine to put into proper context that selective reinstruction. And the fact that this selective supplemental instruction was the *only* response the

26

district court gave in response to repeated requests for additional information tended to highlight it further. *See, e.g.*, *Arroyo v. Jones*, 685 F.2d 35, 40 (2d Cir. 1982) (concluding that, particularly "in light of [the jury's] repeated questioning," "it seems highly likely that the supplemental charge was in the forefront of the jurors' minds")

### B.   Prior Decisions of This Court and Other Circuits Support Finding That the Trial Court Abused Its Discretion When It Selectively Reinstructed the Jury Only with Language from the Charged Offenses

The fundamental error in the trial court's response to the jury's question here in many ways mirrors that confronted by the Eighth Circuit in *United States v. Van Dyke*, 14 F.3d 415, 423 (8th Cir. 1994), where the court of appeals reversed the judgment, in part, because it found that the trial court created the potential for prejudice in the manner in which it handled jury questions. After charging the jury, the district court in *Van Dyke* did not provide the jurors written copies of the instructions for use in their deliberations. Soon after, the jury requested copies of the indictment, which the court provided. Next, the jury asked the court for the language of one of the applicable statutes, and the court read it out orally. The jury then asked for written copies of the jury instructions; the court "initially refused to make the court reporter retype the instructions, but then said he would allow it after counsel for the government said they had no objection." *Id.* The court of appeals noted, however, that "[t]here [was] no indication that the instructions were ever

27

given to the jury, apparently because they reached a verdict before the court reporter finished transcribing them." *Id.*

The court of appeals in *Van Dyke* "recognize[d] that the decision on whether to give the jury a written copy of the court's instructions is within a trial judge's sound discretion," but nevertheless found that the court abused that discretion—for reasons directly applicable to the Kings' case. *Id.* As here, the *Van Dyke* court focused on the fact that the trial concerned "a complex series of transactions and a multiple count indictment" for fraud. *Id.* It also emphasized the fact that the court "gave the jury a one-sided view of the case" by providing it with the charging document (even though the jury asked for it), particularly "in light of the fact that they did not have a set of neutral written jury instructions to guide them in their deliberations." *Id.* Similarly, here, the district court (as in *Van Dyke*) read back to the jury only the portions of the jury instructions describing the crimes of which the Kings were charged, JA674-JA676—akin to the charging document in *Van Dyke*. Given that context, the court in *Van Dyke* held that the trial judge should have mitigated against the potential for prejudice by providing copies of the full instruction to the jurors, and that "by not making written instructions available," that court "abused its discretion." *Id.*

In *United States v. Pennix*, the Fourth Circuit had occasion to consider *Van Dyke*, but determined that the factual circumstances in *Pennix* made its holding

inapplicable there, where it found no evidence that "the district court's decision not to provide the jury a copy of the instructions resulted in unfair prejudice or confusion."  Nos. 97-4575 and 97-4576, 1998 WL 279342, at *2 (May 20, 1998) (per curiam).  But the contrasts highlighted in *Pennix* actually only strengthen the applicability of the rationale in *Van Dyke* to the Kings' case.  After all, in contrast to the trial in *Van Dyke* (and here), the *Pennix* court held that the defendant's trial "was hardly complex," concerning as it did "only three simple drug and firearms violations," *id.* at *2-3, as opposed to "multiple [*i.e.*, nine, *Van Dyke*, 14 F.3d at 417] counts" of fraud "involving complex legal and factual issues," *id.* at 422. Here, the Kings were collectively charged with *25 counts* of health care fraud, conspiracy to commit health care fraud, and identity theft; the trial spanned multiple days and included the testimony of nearly two dozen witnesses (many with difficult-to-remember, non-Western names); and jurors were tasked with sifting through what the prosecutor characterized as a "volume of evidence." JA607.  Furthermore, the *Pennix* court reasoned, the rationale in *Van Dyke* was inapplicable because, there, "[o]nce deliberations began, the *Van Dyke* jury . . . expressly *requested* a copy of the instructions."  *Pennix*, 1998 WL 279342 at *2— just as the jury did here, *see* JA674; *see also* JA670 (requesting, just one hour after the jury instructions were read to them, a "witness list" or "transcript of the proceedings" "to be able to keep track" of all the information conveyed at trial).

This Court came to a similar conclusion in *United Medical*, holding that the trial court's emphasis of only part of the initial jury instructions in the supplemental charge was mitigated by the fact that the jurors had a copy of the full jury instructions to review. 989 F.2d at 1406-07. The selective supplemental instruction did not "improperly focus[] the jury's attention on" a prejudicial "nexus," the court held, because it "referred the jury to the court's original instructions" and the district court prefaced its selective instruction with an admonition to the jury that it "should carefully reread the Court's instructions on the law of conspiracy.'" *Id.* at 1407 (quoting note from trial court to jury).

Likewise, in an unpublished decision in *United States v. Turner*, this Court held that the trial court did not abuse its discretion when it responded to the jury's questions by "rereading the pertinent portions of the instructions without displaying partiality to the Government" because the court, carefully "noting that it did not want to place undue emphasis on any particular portion of the instructions," "directed the jury to keep in mind the instructions as a whole before it proceeded." No. 97-4104, 1998 WL 67797, at *2 (4th Cir. Feb. 20, 1998). There, again, the jury had a copy of the instructions to which it could refer and use to put the selective reinstruction into context. *See id.* at *2 (quoting the district court as directing the jury to the written "full set of instructions" it had provided, and

reminding the jury that "you have to think about the charge as a whole, and everything is interrelated").

Here, by contrast, there was nothing before the jury to minimize the prejudicial effect of the court's selective supplemental instruction. The trial court adamantly refused the jury's repeated requests for written copies of a handful of documents, including a copy of the jury instructions. *See* JA674. Because the jury had no complete set of instructions to which it could refer, the court could not mitigate the effect of its choice to reinstruct selectively only the crimes charged without mentioning the particular elements the government had to prove, the government's burden of proof, and the Kings' presumption of innocence with regard to those elements.

### C.   The Trial Court's Selective Reinstruction Prejudiced the Kings' Defense

An error in "a district court's decision to respond to a jury's question, and the form of that response," "requires reversal . . . if it is prejudicial in the context of the record as a whole." *Foster*, 507 F.3d at 244. The court's selective reinstruction improperly focused the jury's attention on descriptions of the charged offenses and away from the specific elements the government had to prove, and the government's burden in doing so. *Cf. United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965) ("[T]he submission should outline to the jury the elements of the crime. . . . The omission was not supplied by the reading of the statute to the jury.

31

In every criminal prosecution, we have heretofore insisted, an exposition of the constituents of the offense is mandatory and indispensable.").

The resulting prejudice was amplified by the court's repeated efforts to rush the trial along, which both inhibited the Kings from making holes in the government's case and improperly suggested to the jury that the court viewed the trial as an unimportant, open-and-shut case, and that the points the defense was trying to make were unworthy of the court's time. *Cf. Van Dyke*, 14 F.3d at 418, 424 (discussing, as part of its review of the record "as a whole," statements from the court that "could have given the jury an early impression (even if incorrect) that the trial judge was not interested in what [the defense] had to say").

### 1. *The Trial Court's Selective Reinstruction Undercut the Defense's Theory of the Case*

By selectively emphasizing the language of the charged offenses in isolation from the elements the government needed to prove, and the government's burden in doing so, as opposed to recharging an obviously confused jury with the instructions in full, the court prejudiced the defense's theory of the case. The defense did not present its own case-in-chief, choosing instead to put the government to its burden through rigorous cross-examination of the few prosecution witnesses who attributed fraud to the Kings. In light of the fact that the jury "did not have a set of neutral written jury instructions to guide them in their deliberations," *Van Dyke*, 14 F.3d at 423, the court's selective reinstruction

32

"gave the jury a one-sided view of the case," *id.*, that, when combined with other aspects of the trial, prejudiced the Kings by emphasizing matters favorable to the government and deemphasizing (by not mentioning) matters favorable to the defense. *Cf., e.g.*, *Smith*, 62 F.3d at 646 (noting that the district court must respond to a jury question "fairly and accurately *without creating prejudice*") (emphasis added).

Out of a three-day trial featuring 22 witnesses and thousands of pages of evidence, the government's entire fraud case hinged on the jury crediting the testimony of at most five witnesses who alone alleged that either of the Kings personally engaged in fraud. *See* JA179, JA182 (Justice); JA309-JA312 (Allen); JA448-JA449, JA552 (Blell); JA519-JA527 (Kanu); JA569 (Hussain). The Kings never disputed that Bright Beginnings made significant billing errors that resulted in overbilling Medicaid and BlueCross/BlueShield, and never contested evidence that Bright Beginnings produced fraudulent documents. The Kings' defense was that they were inexperienced managers who outsourced to employees key aspects of the running of their business, most notably billing. *See, e.g.*, JA631-JA634, JA641. To that end, through cross-examining the government's nearly two-dozen witnesses, they showed that it was in fact two Bright Beginnings employees, Josephine Owusu and Violet Kincaid, who handled billings during a significant part of the period in the indictment—from at least September 2008 (JA321-JA322

(Allen)) to March 2010, *see* JA236-JA237 (Kincaid); JA320, JA321, JA340 (Allen); JA536-JA537 (Kanu); *cf.* JA22 (Indictment) (alleging fraud in billing from March 2008 through June 2011).

Indeed, the Kings' defense consisted largely of poking holes in the testimony of the government's key witnesses during the prosecution's case-in-chief. For instance, the Kings pointed out contradictions between Nicole Justice's testimony and that of other government witnesses, *compare, e.g.*, JA179-JA181 (Justice), *with* JA276-JA277 (Kincaid), and showed that Justice was close friends with, JA184, and worked several months for, JA188, Nenneh Blell, the government's star witness. As for Blell, the Kings highlighted her cooperation agreement with prosecutors, JA486-JA489; pointed out the repeated lies that she told, including how she assumed the identity of another woman to cover up the fact that she did not have her nursing license, JA463-JA465, falsified documents to Medicaid, JA480-JA481, and lied to immigration officials, JA457-JA459, JA477-JA479; that she had a strong motivation to lie again at this trial to protect her current license and be able to provide for her family, JA486, JA492; and that subsequent to her work at Bright Beginnings she worked as a nurse, while still unlicensed, for a home health care company run by *the former Bright Beginnings employee in charge of billing*, Josephine Owusu, JA462, before opening up her own competing home health care company, JA473; *accord* JA181 (Justice). The

Kings elicited testimony from Nadia Kanu that she, too, was an employee of Josephine Owusu's, and thus had an interest in supporting her version of events. JA530 (Kanu). And they got Abid Hussain to admit that his wife, the Bright Beginnings employee who provided care for his son, JA576, appeared to have signed paychecks covering a period during which he testified Bright Beginnings never provided care, JA578-JA579; *see also* Def. Ex. 10, and during which he said his wife had never submitted time sheets and had never been paid, JA574. And Special Agent Vanderbunt conceded she had not even checked to see whether the nurses or the Kings had received the benefit of the allegedly fraudulent overbilling. JA591-JA592. The Kings rested their case because they reasonably believed the government had not met its burden to show that the Kings *intentionally* engaged in any wrongdoing.

To have any chance of success, the Kings' theory of the case necessarily depended on the jury being able to sift through the dozens of witnesses' testimonies and significant "volume of evidence," JA654—most of which did nothing more than show that Bright Beginnings overbilled or that *someone* had falsified documents—to see the weaknesses in the government's key witnesses' testimony, and to apply rigorously the government's burden of proof to each element of the offenses with which they were charged. Once the jury made plain to the court its substantial confusion regarding the proceedings and the jury charge,

*see* JA668, JA670; JA674, the court should have reread to the jury the original jury instructions in their entirety. A complete reinstruction would have reminded an obviously confused jury of the elements the government needed to prove, and the burden with which it must prove them. The jurors who plainly did not "'get it'" on the first hearing would have had a better chance of doing so on a complete reinstruction. *Gacy*, 994 F.2d at 312 (citations omitted). Instead, however, the court "mudd[ied] the waters" (*Glover*, 681 F.3d at 423) with a selective and lopsided reinstruction that emphasized the crimes of which the Kings were charged without any mention of the elements the government had to prove, or the burden with which it had to do so.

Nor is it sufficient, in the face of the jury's persistent confusion, that the court had previously read the jury a complete set of instructions. It is black letter law that an error in a supplemental jury instruction is "not cured by a prior unexceptional and unilluminating abstract charge." *Bollenbach*, 326 U.S. at 612. Instead, "[a] supplemental charge must be viewed in a special light," given the fact that "[i]t will enjoy special prominence in the minds of the jurors . . . ." *Arroyo*, 685 F.2d at 39. This is all the more true when, as here, the jury does not have a written copy of the complete jury instructions with which it can put the selective reinstruction into context. In such a scenario, by necessity, "[t]he court's answer was the last word which the jury carried back to the jury room . . . [and] must be

36

regarded as the only effective instruction on the troublesome point to which the inquiry was directed. *Simpson*, 362 F.2d at 734.

### 2. The Trial Court's Directives to Counsel to Speed Along the Trial Further Prejudiced the Defense

In keeping with the court's impatience with jurors that "want[] too many things," JA668, and that just needed to "get on with their verdict," JA673, the court could not have made clearer throughout the trial its desire to conclude proceedings as quickly as possible, no matter what important evidence remained to be considered and contested. The court's actions inhibited the Kings' defense and sent a message to the jury that the trial was not worth the court's time.

On the second day of trial, with eight witnesses left to testify, the court's patience was already wearing thin. In front of the jury, the court instructed counsel to "get them [*i.e.*, the remaining witnesses] on and off as quickly as we can." JA472. One of those witnesses was Nenneh Blell, whose testimony was important enough to the government that it entered into an agreement not to prosecute her for fraudulently practicing as a nurse by signing official documents with another nurse's name. JA431-JA432 (Blell). As with all the previous witnesses, counsel for Mrs. King expressed his interest in conducting his own cross-examination after counsel for Mr. King finished. This obviously displeased the court (JA474-JA475):

THE COURT:      Do you have any questions of this witness?

MR. KHOURI:      Oh, yes.

THE COURT:      Really?

The court's incredulity could only have informed the jury that it viewed the defense's efforts to discredit the testimony as unpersuasive and not worth its time—or the jury's. *Cf. Van Dyke*, 14 F.3d at 418 (trial court's statement that "I sort of drifted away. What was the question?" "could have given the jury an early impression (even if incorrect) that the trial judge was not interested" in the testimony).

On the third day of trial, the court instructed counsel, again in front of the jury, to "make all three of [the last witnesses] real brief." JA560. Two of those witnesses were key to the government's case: Abel Hussain, the government's sole witness to support its two aggravated identity-theft counts, whose story had holes in it, *see* p.11, *supra*; and Agent Vanderbunt, who calculated the total alleged fraud loss, JA585-JA587—and who, in doing so, never bothered to look into payroll records to see whether Bright Beginnings' nurses had been paid for all the extra hours that they worked, JA591-JA592 (which would have been in keeping with the Kings' theory that overbillings were a mistake due to poor recordkeeping and billing practices rather than intentional fraud).

Then, when it came time for closing arguments, the trial court twice cut off counsel for Mr. King mid-argument to tell him his 20 minutes were up. JA637-JA638. The message that the defense counsels' arguments did not warrant the court's time and attention was clear to everyone in the courtroom; the first words of Khouri's closing argument were not a plea to the jury, but an assurance to the court that "I'm going to hurry up." JA683. As this Court has held, "[w]hile limitations on the scope or extent of argument are plainly within the discretion of the trial judge, an abuse of discretion may be found when the contested limitations on argument 'prevent [] defense counsel from making a point essential to the defense.'" *Horton*, 921 F.2d at 547 (quoting *United States v. Sawyer*, 443 F.2d 712, 713 (D.C. Cir. 1971)) (internal citation omitted). Given the Kings' theory of the case—that the government had not proven anything beyond the fact that they were bad managers, which they attempted to prove by poking holes in the testimony of the few witnesses who claimed otherwise rather than mounting any defense case-in-chief—closing arguments necessarily assumed greater importance than in a typical case. Combined with the jury's obvious confusion—made apparent immediately after the trial when it requested a list of the witnesses who testified, JA668—the trial court's rushed approach to a 25-count complex criminal fraud case that resulted in the parents of three minor children being sentenced to serve more than 10 years in prison sacrificed a sound verdict for a speedy one. *Cf.*

39

*Martel v. County of Los Angeles*, 56 F.3d 993, 1005 (9th Cir. 1995) (en banc) (Kleinfeld, J., dissenting) ("The most important requirement . . . in any system of justice[] is that the system be just. . . .   Too much speed reduces reliability, so produces less just outcomes.").

Finally, not only did the court's constant prodding to speed up the trial inhibit the Kings in presenting their chosen defense, but its comments—made in front of the jury—gave the suggestion that mounting a vigorous defense was not worth the court's time.  It has long been recognized that, because of their outsized role in a criminal trial, "'trial judges wield substantial influence over juries.'" *United States v. Blanchard*, 542 F.3d 1133, 1151 (7th Cir. 2008) (quoting *United States v. Curry*, 538 F.3d 718, 727 (7th Cir. 2008)).   Indeed, "[a] trial judge's position before a jury is overpowering.  His position makes his slightest action of great weight with the jury." *United States v. Nickl*, 427 F.3d 1286, 1295 (10th Cir. 2005) (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (quotations omitted)).  As a result, a trial judge must "'take particular care that his participation during trial—whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct—never reaches the point at which it appears clear to the jury that the court believes the accused is guilty.'" *United States v. Godwin*, 272 F.3d 659, 678 (4th Cir. 2001) (internal brackets omitted) (quoting *United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (internal

citations and quotations omitted)).  The trial court's comments in the Kings' trial failed to accord with these standards.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the cause remanded for a new trial.

Respectfully submitted,

/s/ Eric A. White
Eric A. White
John P. Elwood
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6549
Fax: (202) 315-3392
ewhite@velaw.com

*Counsel for Defendants-Appellants*
*Irvine and Aisha King*

September 5, 2013

## STATEMENT CONCERNING ORAL ARGUMENT

Newly engaged *pro bono* appellate counsel for the defendants-appellants believe that oral argument would be of great assistance to the Court, particularly in understanding the prejudicial effect of the error in this complex criminal trial.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 9,738 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

/s/ Eric A. White
*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that, on this 5th day of September, 2013, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF System, which

will send notice of such filing to the following registered CM/ECF users:

> Timothy D. Belevetz
> OFFICE OF THE UNITED STATES ATTORNEY
> 2100 Jamieson Ave.
> Alexandria, VA 22314
> Tel: (703) 299-3700
> timothy.d.belevetz@usdoj.gov

> /s/ Eric A. White
> *Counsel for Defendants-Appellants*